(Slip Opinion)     OCTOBER TERM, 2005     1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CENTRAL VIRGINIA COMMUNITY COLLEGE ET AL. *v.* KATZ, LIQUIDATING SUPERVISOR FOR WALLACE'S BOOKSTORES, INC.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 04–885.   Argued October 31, 2005—Decided January 23, 2006

The Bankruptcy Clause, Art. I, §8, cl. 4, empowers Congress to establish "uniform Laws on the subject of Bankruptcies throughout the United States."  In *Tennessee Student Assistance Corporation* v. *Hood,* 541 U. S. 440, this Court, without reaching the question whether the Clause gives Congress the authority to abrogate States' immunity from private suits, see *id.*, at 443, upheld the application of the Bankruptcy Code, 11 U. S. C. §101 *et seq.*, to proceedings initiated by a debtor against a state agency to determine the dischargeability of a student loan debt, see 541 U. S., at 451.  In this case, a proceeding commenced by respondent Bankruptcy Trustee under §§547(b) and 550(a) to avoid and recover alleged preferential transfers by the debtor to petitioner state agencies, the agencies claim that the proceeding is barred by sovereign immunity.  The Bankruptcy Court denied petitioners' motions to dismiss on that ground, and the District Court and the Sixth Circuit affirmed based on the Circuit's prior determination that Congress has abrogated the States' sovereign immunity in bankruptcy proceedings.

*Held:* A bankruptcy trustee's proceeding to set aside the debtor's preferential transfers to state agencies is not barred by sovereign immunity.  Pp. 3–22.

   (a) The Bankruptcy Clause's history, the reasons it was adopted, and the legislation proposed and enacted under it immediately following ratification demonstrate that it was intended not just as a grant of legislative authority to Congress, but also to authorize limited subordination of state sovereign immunity in the bankruptcy

Syllabus

arena. Although statements in *Seminole Tribe of Fla.* v. *Florida*, 517
U. S. 44, reflect an assumption that that case's holding would apply
to the Clause, careful study and reflection convince this Court that
that assumption was erroneous. The Court is not bound to follow its
dicta in a prior case in which the point at issue was not fully debated.
*Cohens* v. *Virginia*, 6 Wheat. 264, 399–400. Pp. 4–5.

(b) States, whether or not they choose to participate, are bound by
a bankruptcy court's order discharging the debtor no less than are
other creditors. *Hood*, 541 U. S., at 448. Petitioners here, like the
state agency parties in *Hood*, have conceded as much. See *id.*, at 449.
The history of discharges in bankruptcy proceedings demonstrates
that these concessions, and *Hood*'s holding, are correct. The Framers'
primary goal in adopting the Clause was to prevent competing sover-
eigns' interference with discharge: The patchwork of wildly divergent
and uncoordinated insolvency and bankruptcy laws that existed in
the American Colonies resulted in one jurisdiction's imprisoning
debtors discharged (from prison and of their debts) in and by another
jurisdiction. The absence of extensive debate at the Convention over
the Clause's text or its insertion into the Constitution indicates that
there was general agreement on the importance of authorizing a uni-
form federal response to the problems and injustice that system cre-
ated. Pp. 5–11.

(c) Bankruptcy jurisdiction, as understood today and at the fram-
ing, is principally *in rem*. See, *e.g., Hood*, 541 U. S., at 447. It thus
does not implicate States' sovereignty to nearly the same degree as
other kinds of jurisdiction. See *id.,* at 450–451. The Framers would
have understood the Bankruptcy Clause's grant of power to enact
laws on the entire "subject of Bankruptcies" to include laws provid-
ing, in certain limited respects, for more than simple adjudications of
rights in the res. Courts adjudicating disputes concerning bankrupts'
estates historically have had the power to issue ancillary orders en-
forcing their *in rem* adjudications. See, *e.g., id.,* at 455–456. The in-
terplay between *in rem* adjudications and orders ancillary thereto is
also evident in this case. Whether or not actions such as this are
properly characterized as *in rem,* those who crafted the Bankruptcy
Clause would have understood it to give Congress the power to au-
thorize courts to avoid preferential transfers and to recover the trans-
ferred property. Pp. 12–15.

(d) Insofar as orders ancillary to the bankruptcy courts' *in rem* ju-
risdiction, like orders directing turnover of preferential transfers, im-
plicate States' sovereign immunity from suit, the States agreed in the
plan of the Constitutional Convention not to assert that immunity.
That is evidenced not only by the Bankruptcy Clause's history, but
also by legislation considered and enacted in the immediate wake of

Syllabus

the Constitution's ratification. For example, the Bankruptcy Act of 1800 specifically granted federal courts habeas authority to release debtors from state prisons at a time when state sovereign immunity was preeminent among the Nation's concerns, yet there appears to be no record of any objection to that grant based on an infringement of sovereign immunity. This history demonstrates that the power to enact bankruptcy legislation was understood to carry with it the power to subordinate state sovereignty, albeit within a limited sphere. Pp. 15–21.

  (e) The Court need not consider the question *Hood* left open: whether Congress' attempt to "abrogat[e]" state sovereign immunity in 11 U. S. C. §106(a) is valid. The relevant question is not abrogation, but whether Congress' determination that States should be amenable to preferential transfer proceedings is within the scope of its power to enact "Laws on the subject of Bankruptcies." Beyond peradventure, it is. Congress' power, at its option, either to treat States in the same way as other creditors or exempt them from the operation of bankruptcy laws arises from the Clause itself; the relevant "abrogation" is the one effected in the plan of the Convention, not by statute. Pp. 21–22.

106 Fed. Appx. 341, affirmed.


  STEVENS, J., delivered the opinion of the Court, in which O'CONNOR, SOUTER, GINSBURG, and BREYER, JJ., joined. THOMAS, J., filed a dissenting opinion, in which ROBERTS, C. J., and SCALIA and KENNEDY, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 04–885

CENTRAL VIRGINIA COMMUNITY COLLEGE, ET AL., PETITIONERS *v.* BERNARD KATZ, LIQUIDATING SUPERVISOR FOR WALLACE'S BOOKSTORES, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[January 23, 2006]

JUSTICE STEVENS delivered the opinion of the Court.

Article I, §8, cl. 4, of the Constitution provides that Congress shall have the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States." In *Tennessee Student Assistance Corporation* v. *Hood,* 541 U. S. 440 (2004), we granted certiorari to determine whether this Clause gives Congress the authority to abrogate States' immunity from private suits. See *id.*, at 443. Without reaching that question, we upheld the application of the Bankruptcy Code to proceedings initiated by a debtor against a state agency to determine the dischargeability of a student loan debt. See *id.*, at 451. In this case we consider whether a proceeding initiated by a bankruptcy trustee to set aside preferential transfers by the debtor to state agencies is barred by sovereign immunity. Relying in part on our reasoning in *Hood*, we reject the sovereign immunity defense advanced by the state agencies.

I

Petitioners are Virginia institutions of higher education

that are considered "arm[s] of the State" entitled to sovereign immunity. See, *e.g.*, *Alden* v. *Maine*, 527 U. S. 706, 756 (1999) (observing that only arms of the State can assert the State's immunity). Wallace's Bookstores, Inc., did business with petitioners before it filed a petition for relief under chapter 11 of the Bankruptcy Code, 11 U. S. C. §101 *et seq.* (2000 ed. and Supp. III), in the United States Bankruptcy Court for the Eastern District of Kentucky. Respondent, Bernard Katz, is the court-appointed liquidating supervisor of the bankrupt estate. He has commenced proceedings in the Bankruptcy Court pursuant to §§547(b) and 550(a) to avoid and recover alleged preferential transfers to each of the petitioners made by the debtor when it was insolvent.[1] Petitioners' motions to dismiss those proceedings on the basis of sovereign immunity were denied by the Bankruptcy Court.

The denial was affirmed by the District Court and the

_____

[1] A preferential transfer is defined as "any transfer of an interest of the debtor in property—

"(1) to or for the benefit of a creditor;

"(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

"(3) made while the debtor was insolvent;

"(4) made—

  "(A) on or within 90 days before the date of the filing of the petition; or

  "(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

"(5) that enables such creditor to receive more than such creditor would receive if—

  "(A) the case were a case under chapter 7 of this title;

  "(B) the transfer had not been made; and

  "(C) such creditor received payment of such debt to the extent provided by the provisions of this title." 11 U. S. C. §547(b).

Respondent also instituted adversary proceedings against some of the petitioners to collect accounts receivable. He has, however, filed a letter with this Court indicating his intent not to pursue those claims further.

Court of Appeals for the Sixth Circuit on the authority of
the Sixth Circuit's prior determination that Congress has
abrogated the States' sovereign immunity in bankruptcy
proceedings. See *Hood* v. *Tennessee Student Assistance
Corporation (In re Hood),* 319 F. 3d 755 (2003). We
granted certiorari, 544 U. S. ___ (2005), to consider the
question left open by our opinion in *Hood:* whether Con-
gress' attempt to abrogate state sovereign immunity in 11
U. S. C. §106(a)[2] is valid. As we shall explain, however,

————

[2] Section 106(a), as amended in 1994, provides in part as follows:

"Notwithstanding an assertion of sovereign immunity, sovereign
immunity is abrogated as to a governmental unit . . . with respect to the
following:

"(1) Sections 105, 106, 107, 108, 303, 346, 362, 363, 364, 365, 366,
502, 503, 505, 506, 510, 522, 523, 524, 525, 542, 543, 544, 545, 546, 547,
548, 549, 550, 551, 552, 553, 722, 724, 726, 728, 744, 749, 764, 901, 922,
926, 928, 929, 944, 1107, 1141, 1142, 1143, 1146, 1201, 1203, 1205,
1206, 1227, 1231, 1301, 1303, 1305, and 1327 of this title.

"(2) The court may hear and determine any issue arising with respect
to the application of such sections to governmental units.

"(3) The court may issue against a governmental unit an order, proc-
ess, or judgment under such sections of the Federal Rules of Bank-
ruptcy Procedure, including an order or judgment awarding a money
recovery, but not including an award of punitive damages. . . ."

The term "governmental unit" is defined to include a "State," a
"municipality," and a "department, agency, or instrumentality of . . . a
State." §101(27).

The above-quoted version of §106(a) is the product of revisions made
in the wake of some of our precedents. The Bankruptcy Reform Act of
1978, 92 Stat. 2549, contained a provision indicating only that "gov-
ernmental unit[s]," defined to include States, were deemed to have
"waived sovereign immunity" with respect to certain proceedings in
bankruptcy and to be bound by a court's determinations under certain
provisions of the Act "notwithstanding any assertion of sovereign
immunity." *Id.,* at 2555–2556. This Court's decisions in *Hoffman* v.
*Connecticut Dept. of Income Maintenance*, 492 U. S. 96 (1989), and
*United States* v. *Nordic Village, Inc.*, 503 U. S. 30 (1992), which held
that Congress had failed to make sufficiently clear in the predecessor to
§106(a) its intent either to "abrogate" state sovereign immunity or to
waive the Federal Government's immunity, see 492 U. S., at 101; 503
U. S., at 39, prompted Congress in 1994 to enact the text of §106(a) now

we are persuaded that the enactment of that provision was not necessary to authorize the Bankruptcy Court's jurisdiction over these preference avoidance proceedings.

Bankruptcy jurisdiction, at its core, is *in rem*. See *Gardner* v. *New Jersey*, 329 U. S. 565, 574 (1947) ("The whole process of proof, allowance, and distribution is, shortly speaking, an adjudication of interests claimed in a *res*"). As we noted in *Hood*, it does not implicate States' sovereignty to nearly the same degree as other kinds of jurisdiction. See 541 U. S., at 450–451 (citing admiralty and bankruptcy cases). That was as true in the 18th century as it is today. Then, as now, the jurisdiction of courts adjudicating rights in the bankrupt estate included the power to issue compulsory orders to facilitate the administration and distribution of the res.

It is appropriate to presume that the Framers of the Constitution were familiar with the contemporary legal context when they adopted the Bankruptcy Clause[3]—a provision which, as we explain in Part IV, *infra*, reflects the States' acquiescence in a grant of congressional power to subordinate to the pressing goal of harmonizing bankruptcy law sovereign immunity defenses that might have been asserted in bankruptcy proceedings. The history of the Bankruptcy Clause, the reasons it was inserted in the Constitution, and the legislation both proposed and enacted under its auspices immediately following ratification

in force. See generally Gibson, Congressional Response to *Hoffman* and *Nordic Village:* Amended Section 106 and Sovereign Immunity, 69 Am. Bankr. L. J. 311 (1995).

[3] In *Cannon* v. *University of Chicago*, 441 U. S. 677, 699 (1979), we endorsed the presumption "that Congress was thoroughly familiar" with contemporary law when it enacted Title IX of the Civil Rights Act of 1964. It is equally proper to presume that the delegates to the Constitutional Convention were fully aware of the potential for injustice, discussed in Part II, *infra*, presented by the nonuniform state laws authorizing imprisonment as a remedy for the nonpayment of an insolvent's debts.

of the Constitution demonstrate that it was intended not just as a grant of legislative authority to Congress, but also to authorize limited subordination of state sovereign immunity in the bankruptcy arena. Foremost on the minds of those who adopted the Clause were the intractable problems, not to mention the injustice, created by one State's imprisoning of debtors who had been discharged (from prison and of their debts) in and by another State. As discussed below, to remedy this problem, the very first Congresses considered, and the Sixth Congress enacted, bankruptcy legislation authorizing federal courts to, among other things, issue writs of habeas corpus directed at state officials ordering the release of debtors from state prisons.

We acknowledge that statements in both the majority and the dissenting opinions in *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44 (1996), reflected an assumption that the holding in that case would apply to the Bankruptcy Clause. See also *Hoffman* v. *Connecticut Dept. of Income Maintenance*, 492 U. S. 96, 105 (1989) (O'CONNOR, J., concurring). Careful study and reflection have convinced us, however, that that assumption was erroneous. For the reasons stated by Chief Justice Marshall in *Cohens* v. *Virginia*, 6 Wheat. 264 (1821), we are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated. See *id.*, at 399–400 ("It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision").

## II

Critical features of every bankruptcy proceeding are the

exercise of exclusive jurisdiction over all of the debtor's property, the equitable distribution of that property among the debtor's creditors, and the ultimate discharge that gives the debtor a "fresh start" by releasing him, her, or it from further liability for old debts. See, *e.g.*, *Local Loan Co.* v. *Hunt*, 292 U. S. 234, 244 (1934). "Under our longstanding precedent, States, whether or not they choose to participate in the proceeding, are bound by a bankruptcy court's discharge order no less than other creditors." *Hood*, 541 U. S., at 448. Petitioners here, like the state agencies that were parties in *Hood*, have conceded as much. See *id.*, at 449 (noting concession that "States are generally bound by a bankruptcy court's discharge order"); Tr. of Oral Arg. 8–9 (Oct. 31, 2005).

The history of discharges in bankruptcy proceedings demonstrates that the state agencies' concessions, and *Hood*'s holding, are correct. The term "discharge" historically had a dual meaning; it referred to both release of debts and release of the debtor from prison. Indeed, the earliest English statutes governing bankruptcy and insolvency authorized discharges of persons, not debts. One statute enacted in 1649 was entitled "An act for discharging Poor Prisoners unable to satisfy their creditors." See 2 Acts and Ordinances of the Interregnum, 1642–1660, pp. 240–241 (C. Firth & R. Rait eds. 1911). The stated purpose of the Act was to "Discharge . . . the person of [the] Debtor" "of and from his or her Imprisonment." *Ibid.* Not until 1705 did the English Parliament extend the discharge (and then only for traders and merchants) to include release of debts. See 4 Ann., ch. 17, §7 (providing that upon compliance with the statute, "all and every person and persons so becoming bankrupt . . . shall be discharged from all debts by him, her, or them due and owing at the time that he, she, or they did become bankrupt"); see also McCoid, Discharge: The Most Important Development in Bankruptcy History, 70 Am. Bankr. L. J.

163, 167 (1996).

Well into the 18th century, imprisonment for debt was still ubiquitous in England[4] and the American Colonies. Bankruptcy and insolvency laws remained as much concerned with ensuring full satisfaction of creditors (and, relatedly, preventing debtors' flight to parts unknown[5]) as with securing new beginnings for debtors. Illustrative of bankruptcy laws' harsh treatment of debtors during this period was that debtors often fared worse than common criminals in prison; unfortunate insolvents, unlike criminals, were forced to provide their own food, fuel, and clothing while behind bars. See B. Mann, Republic of Debtors: Bankruptcy in the Age of American Independence 78–108 (2002).

Common as imprisonment itself was, the American Colonies, and later the several States, had wildly divergent schemes for discharging debtors and their debts. *Id.*, at 79 ("The only consistency among debt laws in the eighteenth century was that every colony, and later every state, permitted imprisonment for debt—most on *mesne* process, and all on execution of a judgment"). At least four jurisdictions offered relief through private Acts of their legislatures. See *Railway Labor Executives' Assn.* v. *Gibbons*, 455 U. S. 457, 472 (1982). Those Acts released debtors from prison upon surrender of their property, and many coupled the release from prison with a discharge of debts. Other jurisdictions enacted general laws providing for

---

[4] Imprisonment for debt was not abolished in England until 1869, and then only subject to certain exceptions. See Debtors Act, 1869, 32 & 33 Vict., ch. 62, §4; see also Cohen, The History of Imprisonment for Debt and its Relation to the Development of Discharge in Bankruptcy, 3 J. Leg. Hist. 153, 164 (1982).

[5] The legislation widely acknowledged to be the first English bankruptcy statute, 34 & 35 Hen. 8, ch. 4, §1 (1542), contained a provision explaining that the statute was needed to deal with the growing number of debtors who, after "craftily obtaining into their Hands great Substance of other Men's Goods, do suddenly flee to Parts unknown."

release from prison and, in a few places, discharge of debt. Others still granted release from prison, but only in exchange for indentured servitude. Some jurisdictions provided no relief at all for the debtor. See generally P. Coleman, Debtors and Creditors in America: Insolvency, Imprisonment for Debt, and Bankruptcy, 1607–1900 (1999).[6]

The difficulties posed by this patchwork of insolvency and bankruptcy laws were peculiar to the American experience. In England, where there was only one sovereign, a single discharge could protect the debtor from his jailer and his creditors. As two cases—one litigated before the Constitutional Convention in Philadelphia and one litigated after it—demonstrate, however, the uncoordinated actions of multiple sovereigns, each laying claim to the debtor's body and effects according to different rules, rendered impossible so neat a solution on this side of the Atlantic.

In the first case, *James* v. *Allen*, 1 Dall. 188 (C. P. Phila. Cty. 1786), Jared Ingersoll, an attorney who a year later would become a delegate to the Philadelphia Convention,[7]

_____

[6] "At the time of the Revolution, only three of the thirteen colonies . . . had laws discharging insolvents of their debts. No two of these relief systems were alike in anything but spirit. In four of the other ten colonies, insolvency legislation was either never enacted or, if enacted, never went into effect, and in the remaining six colonies, full relief was available only for scattered, brief periods, usually on an *ad hoc* basis to named insolvents." Coleman, Debtors and Creditors in America, at 14.

[7] Ingersoll was admitted to the Philadelphia bar in 1773 and elected a member of the Continental Congress in 1780. After serving as a delegate to the Constitutional Convention, he became a member of the Philadelphia Common Council. He served as attorney general of Pennsylvania from 1790 to 1799 and again from 1811 to 1817. From March 1821 until his death in 1822 he served as a judge in the District Court for the City and County of Philadelphia. Among the cases he litigated before this Court was *Chisholm* v. *Georgia*, 2 Dall. 419 (1793)—for the State of Georgia, see *ibid.* See also 9 Dictionary of American Biography 468–469 (1932).

represented a Pennsylvania creditor seeking recovery from a debtor who had been released from prison in New Jersey. Shortly after his release, the debtor traveled to Pennsylvania, where he was arrested for nonpayment of the Pennsylvania debt. In seeking release from the Pennsylvania prison, he argued that his debt had been discharged by the New Jersey court. Ingersoll responded that the order granting relief under New Jersey's insolvency laws "only discharged the person of the debtor from arrest within the State of New Jersey." *Id.*, at 190. The court agreed: Whatever effect the order might have had in New Jersey, the court said, it "goes no further than to discharge [the debtor] from his imprisonment in the Gaol of Essex County in the State of New Jersey; which, if the fullest obedience were paid to it, could not authorize a subsequent discharge from imprisonment in another Gaol, in another State." *Id.*, at 192. The court further observed that "[i]nsolvent laws subsist in every State in the Union, and are probably all different from each other . . . . Even the Bankrupt Laws of England, while we were the subjects of that country, were never supposed to extend here, so as to exempt the persons of the Bankrupts from being arrested." *Id.*, at 191.

In the second case, *Millar* v. *Hall*, 1 Dall. 229 (Pa. 1788), which was decided the year after the Philadelphia Convention, Ingersoll found himself arguing against the principle announced in *James*. His client, a debtor named Hall, had been "discharged under an insolvent law of the state of Maryland, which is in the nature of a general bankrupt[cy] law." 1 Dall., at 231. Prior to his discharge, Hall had incurred a debt to a Pennsylvanian named Millar. Hall neglected to mention that debt in his schedule of creditors presented to the Maryland court, or to personally notify Millar of the looming discharge. Following the Maryland court's order, Hall traveled to Pennsylvania and was promptly arrested for the unpaid debt to Millar.

Responding to Millar's counsel's argument that the holding of *James* controlled, Ingersoll urged adoption of a rule that "the discharge of the Defendant in one state ought to be sufficient to discharge [a debtor] in every state." 1 Dall., at 231. Absent such a rule, Ingersoll continued, "perpetual imprisonment must be the lot of every man who fails; and all hope of retrieving his losses by honest and industrious pursuits, will be cut off from the unfortunate bankrupt." *Ibid.* The court accepted this argument. Allowing a creditor to execute "upon [a debtor's] person out of the state in which he has been discharged," the court explained, "would be giving a superiority to some creditors, and affording them a double satisfaction—to wit, a proportionable dividend of his property there, and the imprisonment of his person here." *Id.*, at 232. Indeed, the debtor having already been obliged to surrender all of his effects, "to permit the taking [of] his person here, would be to attempt to compel him to perform an impossibility, that is, to pay a debt after he has been deprived of every means of payment,—an attempt which would, at least, amount to perpetual imprisonment, unless the benevolence of his friends should interfere to discharge [his] account." *Ibid.*

These two cases illustrate the backdrop against which the Bankruptcy Clause was adopted. In both *James* and *Millar*, the debtors argued that the earlier discharge should be given preclusive effect pursuant to the Full Faith and Credit Clause of the Articles of Confederation. See *James*, 1 Dall., at 190; *Millar*, 1 Dall., at 231. That possibility was the subject of discussion at the Constitutional Convention when a proposal to encompass legislative Acts, and insolvency laws in particular, within the coverage of the Full Faith and Credit Clause of the Constitution was committed to the Committee of Detail[8] together

------

[8] The Committee of Detail was created by the Convention on July 25,

with a proposal "'[t]o establish uniform laws upon the subject of bankruptcies, and respecting the damages arising on the protest of foreign bills of exchange.'" See Nadelmann, On the Origin of the Bankruptcy Clause, 1 Am. J. Legal Hist. 215, 216–217, 219 (1957); see also Plank, The Constitutional Limits of Bankruptcy, 63 Tenn. L. Rev. 487, 527–528 (1996). A few days after this proposal was taken under advisement, the Committee of Detail reported that it had recommended adding the power "'[t]o establish uniform laws upon the subject of bankruptcies'" to the Naturalization Clause of what later became Article I.

The Convention adopted the Committee's recommendation with very little debate two days later. Roger Sherman of Connecticut alone voted against it, apparently because he was concerned that it would authorize Congress to impose upon American citizens the ultimate penalty for debt then in effect in England: death. See J. Madison, Notes of Debates in the Federal Convention of 1787, p. 571 (Ohio Univ. Press ed. 1966). The absence of extensive debate over the text of the Bankruptcy Clause or its insertion indicates that there was general agreement on the importance of authorizing a uniform federal response to the problems presented in cases like *James* and *Millar*.[9]

––––––––––

1787, to prepare a draft text of the Constitution based on delegates' proposals.

[9] Of course, the Bankruptcy Clause, located as it is in Article I, is "'intimately connected'" not just with the Full Faith and Credit Clause, which appears in Article IV of the Constitution, but also with the Commerce Clause. See *Railway Labor Executives' Assn.* v. *Gibbons*, 455 U. S. 457, 466 (1982) (quoting The Federalist No. 42, p. 285 (N. Y. Heritage Press 1945)). That does not mean, however, that the state sovereign immunity implications of the Bankruptcy Clause necessarily mirror those of the Commerce Clause. Indeed, the Bankruptcy Clause's unique history, combined with the singular nature of bankruptcy courts' jurisdiction, discussed *infra*, have persuaded us that the ratification of the Bankruptcy Clause does represent a surrender by the

### III

Bankruptcy jurisdiction, as understood today and at the time of the framing, is principally *in rem* jurisdiction. See *Hood*, 541 U. S., at 447; *Local Loan Co.*, 292 U. S., at 241; *Straton* v. *New*, 283 U. S. 318, 320–321 (1931); *Hanover Nat. Bank* v. *Moyses*, 186 U. S. 181, 192 (1902); *New Lamp Chimney Co.* v. *Ansonia Brass & Copper Co.*, 91 U. S. 656, 661–662 (1876). In bankruptcy, "the court's jurisdiction is premised on the debtor and his estate, and not on the creditors." *Hood*, 541 U. S., at 447. As such, its exercise does not, in the usual case, interfere with state sovereignty even when States' interests are affected. See *id.*, at 448.

The text of Article I, §8, cl. 4, of the Constitution, however, provides that Congress shall have the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States." Although the interest in avoiding unjust imprisonment for debt and making federal discharges in bankruptcy enforceable in every State was a primary motivation for the adoption of that provision, its coverage encompasses the entire "subject of Bankruptcies." The power granted to Congress by that Clause is a unitary concept rather than an amalgam of discrete segments.

The Framers would have understood that laws "on the subject of Bankruptcies" included laws providing, in certain limited respects, for more than simple adjudications of rights in the res. The first bankruptcy statute, for example, gave bankruptcy commissioners appointed by the district court the power, *inter alia*, to imprison recalcitrant third parties in possession of the estate's assets. See Bankruptcy Act of 1800, §14, 2 Stat. 25 (repealed 1803).

----

States of their sovereign immunity in certain federal proceedings. That conclusion is implicit in our holding in *Tennessee Student Assistance Corporation* v. *Hood,* 541 U. S. 440 (2004).

More generally, courts adjudicating disputes concerning
bankrupts' estates historically have had the power to issue
ancillary orders enforcing their *in rem* adjudications. See,
*e.g.*, 2 W. Blackstone, Commentaries on the Laws of Eng-
land 486 (1766) (noting that the assignees of the bank-
rupt's property—the 18th-century counterparts to today's
bankruptcy trustees—could "pursue any *legal* method of
recovering [the debtor's] property so vested in them," and
could pursue methods in equity with the consent of the
creditors); Plank, 63 Tenn. L. Rev., at 523 (discussing
State insolvency and bankruptcy laws in the 18th century
empowering courts to recover preferential transfers); see
also *Ex parte Christy*, 3 How. 292, 312, 314 (1844) (Story,
J.) (describing bankruptcy jurisdiction under the 1841 Act
in broad terms); *Wright* v. *Union Central Life Ins. Co.*, 304
U. S. 502, 513–514 (1938) (defining "bankruptcy" as the
"'subject of the relations between an insolvent or nonpay-
ing or fraudulent debtor and his creditors, *extending to his
and their relief*'" (emphasis added)).

Our decision in *Hood* illustrates the point. As the dis-
senters in that case pointed out, it was at least arguable
that the particular procedure that the debtor pursued to
establish dischargeability of her student loan could have
been characterized as a suit against the State rather than
a purely *in rem* proceeding. See 541 U. S., at 455–456
(THOMAS, J., dissenting). But because the proceeding was
merely ancillary to the Bankruptcy Court's exercise of its
*in rem* jurisdiction, we held that it did not implicate state
sovereign immunity. The point is also illustrated by Con-
gress' early grant to federal courts of the power to issue *in
personam* writs of habeas corpus directing States to re-
lease debtors from state prisons, discussed in Part IV,
*infra*. See *Braden* v. *30th Judicial Circuit Court of Ky.*,
410 U. S. 484, 494–495 (1973) ("The writ of habeas corpus
does not act upon the prisoner who seeks relief, but upon
the person who holds him in what is alleged to be unlawful

custody").

The interplay between *in rem* adjudications and orders ancillary thereto is evident in the case before us. Respondent first seeks a determination under 11 U. S. C. §547 that the various transfers made by the debtor to petitioners qualify as voidable preferences. The §547 determination, standing alone, operates as a mere declaration of avoidance. That declaration may be all that the trustee wants; for example, if the State has a claim against the bankrupt estate, the avoidance determination operates to bar that claim until the preference is turned over. See §502(d). In some cases, though, the trustee, in order to marshal the entirety of the debtor's estate, will need to recover the subject of the transfer pursuant to §550(a). A court order mandating turnover of the property, although ancillary to and in furtherance of the court's *in rem* jurisdiction, might itself involve *in personam* process.

As we explain in Part IV, *infra*, it is not necessary to decide whether actions to recover preferential transfers pursuant to §550(a) are themselves properly characterized as *in rem*.[10] Whatever the appropriate appellation, those

---

[10] The proper characterization of such actions is not as clear as petitioners suggest. The Court in *Nordic Village, Inc.*, 503 U. S., at 38, stated, as an alternative basis for rejecting a bankruptcy trustee's argument that a suit to avoid a preferential transfer made to the Internal Revenue Service was an action *in rem*, that any *in rem* "exception" to sovereign immunity was unavailable in that case because the trustee sought to recover a "sum of money, not 'particular dollars.'" There was, in the Court's view, "no *res* to which the [bankruptcy] court's *in rem* jurisdiction could have attached." *Ibid.* In making that determination, the Court distinguished our earlier decision in *United States* v. *Whiting Pools, Inc.*, 462 U. S. 198 (1983), which held that the debtor's "estate," the res, "includes property of the debtor that has been seized by a creditor prior to the filing of a [bankruptcy] petition." *Id.*, at 209; see also *Begier* v. *IRS*, 496 U. S. 53, 58 (1990) ("'property of the debtor' subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings"). We

who crafted the Bankruptcy Clause would have understood it to give Congress the power to authorize courts to avoid preferential transfers and to recover the transferred property. Petitioners do not dispute that that authority has been a core aspect of the administration of bankrupt estates since at least the 18th century. See, *e.g.*, *Rust* v. *Cooper*, 2 Cowp. 629, 633–634, 98 Eng. Rep. 1277, 1280 (K. B. 1777); *Alderson* v. *Temple*, 1 Black. W. 660, 661–663, 96 Eng. Rep. 384, 385 (K. B. 1768); see also McCoid, Bankruptcy, Preferences, and Efficiency: An Expression of Doubt, 67 Va. L. Rev. 249, 251–253 (1981) (discussing English precedents, dating back to Sir Edward Coke's discussion in *The Case of Bankrupts*, 2 Co. Rep. 25a, 76 Eng. Rep. 441 (K. B. 1589), addressing bankruptcy commissioners' power to avoid preferences); *In re Dehon, Inc.*, 327 B. R. 38, 62–65 (Bkrtcy. Ct. Mass. 2005) (collecting historical materials). And it, like the authority to issue writs of habeas corpus releasing debtors from state prisons, see Part IV, *infra*, operates free and clear of the State's claim of sovereign immunity.

## IV

Insofar as orders ancillary to the bankruptcy courts' *in rem* jurisdiction, like orders directing turnover of preferential transfers, implicate States' sovereign immunity from suit, the States agreed in the plan of the Convention not to assert that immunity. So much is evidenced not only by the history of the Bankruptcy Clause, which shows that the Framers' primary goal was to prevent competing sovereigns' interference with the debtor's discharge, see

―――――――――

observe that the trustee in this case, unlike the one in *Nordic Village*, seeks, in the alternative, both return of the "value" of the preference, see 11 U. S. C. §550(a), and return of the actual "property transferred," *ibid.* See Brief for Respondent 37 ("Respondent invokes the *in rem* jurisdiction of the bankruptcy court to recover under section 550 'the property transferred'").

Part II, *supra*, but also by legislation considered and enacted in the immediate wake of the Constitution's ratification.

Congress considered proposed legislation establishing uniform federal bankruptcy laws in the first and each succeeding Congress until 1800, when the first Bankruptcy Act was passed. See C. Warren, Bankruptcy in United States History 10 (1935) ("[I]n the very first session of the 1st Congress, during which only the most necessary subjects of legislation were considered, bankruptcy was one of those subjects; and as early as June 1, 1789, a Committee of the House was named to prepare a bankruptcy bill"). The Bankruptcy Act of 1800 was in many respects a copy of the English bankruptcy statute then in force. It was, like the English law, chiefly a measure designed to benefit creditors. Like the English statute, its principal provisions permitted bankruptcy commissioners, on appointment by a federal district court, to arrest the debtor, see §4, 2 Stat. 22; to "cause the doors of the dwelling-house of [the] bankrupt to be broken," §4, *id.*, at 23–24; to seize and collect the debtor's assets, §5, *id.*, at 23; to examine the debtor and any individuals who might have possession of the debtor's property, §§14, 18, 19, *id.*, at 25–27; and to issue a "certificate of discharge" once the estate had been distributed, §36, *id.*, at 31.

The American legislation differed slightly from the English, however. That difference reflects both the uniqueness of a system involving multiple sovereigns and the concerns that lay at the core of the Bankruptcy Clause itself. The English statute gave a judge sitting on a court where the debtor had obtained his discharge the power to order a sheriff, "Bailiff or Officer, Gaoler or Keeper of any Prison" to release the "Bankrupt out of Custody" if he were arrested subsequent to the discharge. 5 Geo. 2, ch. 30, ¶13 (1732). The American version of this provision was worded differently; it specifically granted federal courts

the authority to issue writs of habeas corpus effective to release debtors from state prisons. See §38, 2 Stat. 32; see also *In re Comstock*, 6 F. Cas. 237, 239 (No. 3,073) (Vt. 1842) (observing that Bankruptcy Act of 1800, then repealed, would have granted a federal court the power to issue a writ of habeas corpus to release a debtor from state prison if he had been arrested following his bankruptcy discharge).

This grant of habeas power is remarkable not least because it would be another 67 years, after ratification of the Fourteenth Amendment, before the writ would be made generally available to state prisoners. See *Ex parte Royall*, 117 U. S. 241, 247 (1886).[11] Moreover, the provision of the 1800 Act granting that power was considered and adopted during a period when state sovereign immunity could hardly have been more prominent among the Nation's concerns. *Chisholm* v. *Georgia*, 2 Dall. 419, the case that had so "shock[ed]" the country in its lack of regard for state sovereign immunity, *Principality of Monaco* v. *Mississippi*, 292 U. S. 313, 325 (1934), was decided in 1793. The ensuing five years that culminated in adoption of the Eleventh Amendment were rife with discussion of States' sovereignty and their amenability to

_____

[11] The Judiciary Act of 1789 authorized issuance of the writ, but only to release those held in *federal* custody. See Haines, The Uniformity Power: Why Bankruptcy is Different, 77 Am. Bankr. L. J. 129, 179–181 (2003) (hereinafter Haines). Also, in the interim between 1800 and 1867, Congress authorized limited issuance of the writ in response to two crises it viewed as sufficiently pressing to warrant a federal response: The South Carolina nullification controversy of 1828–1833 and the imprisonment of a foreign national by New York State a few years later. See 4 Stat. 632 (1833); 5 Stat. 539 (1842); see also W. Duker, A Constitutional History of Habeas Corpus 187–189 (1980). The 1833 statute made the writ available to U. S. citizens imprisoned by States for actions authorized by federal law, while the 1842 statute gave federal judges the power to release foreign nationals imprisoned for actions authorized by foreign governments.

suit. Yet there appears to be no record of any objection to the bankruptcy legislation or its grant of habeas power to federal courts based on an infringement of sovereign immunity. See Haines 184–185.

This history strongly supports the view that the Bankruptcy Clause of Article I, the source of Congress' authority to effect this intrusion upon state sovereignty, simply did not contravene the norms this Court has understood the Eleventh Amendment to exemplify. Cf. *Blatchford* v. *Native Village of Noatak*, 501 U. S. 775, 779 (1991) ("[W]e have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition of our constitutional structure which it confirms . . .").[12] Petitioners, ignoring this history, contend that nothing in the *words* of the Bankruptcy Clause evinces an intent on the part of the Framers to alter the "background principle" of state sovereign immunity. *Seminole Tribe of Fla.*, 517 U. S., at 72. Specifically, they deny that the word "uni-

---

[12] Further evidence of the Framers' intent to exempt laws "on the subject of Bankruptcies" from the operation of state sovereign immunity principles can be gleaned from §62 of the Bankruptcy Act of 1800. That section provided that "nothing contained in this law shall, in any manner, affect the right of preference to prior satisfaction of debts due to the United States as secured or provided by any law heretofore passed, nor shall be construed to lessen or impair any right to, or security for, money due to the United States or to any of them." 2 Stat. 36. That Congress felt the need to carve out an exception for States' preferences undermines any suggestion that it was operating against a background presumption of state sovereign immunity to bankruptcy laws. Indeed, one contemporary commentator read this section of the Act as requiring that the protected "priorit[ies]" would have to be "specifically given by some act of the Legislature of the Union" before they would be exempt from operation of the Act's provisions. See T. Cooper, The Bankrupt Law of America, Compared with the Bankrupt Law of England 334 (1801) (reprint 1992) ("But I do not apprehend [that] this extends to give any priority to the United States, not specifically given by some act of the Legislature of the Union; nor will the English doctrine of priorities in favour of the crown be extended by analogy into this country").

form" in the Clause implies anything about pre-existing immunities or Congress' power to interfere with those immunities. See Brief for Petitioners 32–42. Whatever the merits of petitioners' argument,[13] it misses the point;

_____

[13] Petitioners make much of precedents suggesting that the word "uniform" represents a limitation, rather than an expansion, of Congress' legislative power in the bankruptcy sphere. See, *e.g.*, *Gibbons*, 455 U. S., at 468 ("Unlike the Commerce Clause, the Bankruptcy Clause itself contains an affirmative limitation or restriction upon Congress' power: bankruptcy laws must be uniform throughout the United States"). They also cite Justice Frankfurter's concurring opinion in *Vanston Bondholders Protective Comm.* v. *Green*, 329 U. S. 156 (1946), for the proposition that "[t]he Constitutional requirement of uniformity is a requirement of geographic uniformity," *id.*, at 172. Based on these authorities, petitioners argue that the word "uniform" in the Bankruptcy Clause cannot be interpreted to confer upon Congress any greater authority to impinge upon state sovereign immunity than is conferred, for example, by the Commerce Clause. See Brief for Petitioners 33.

Petitioners' logic is not persuasive. Although our analysis does not rest on the peculiar text of the Bankruptcy Clause as compared to other Clauses of Article I, we observe that, if anything, the mandate to enact "uniform" laws supports the historical evidence showing that the States agreed not to assert their sovereign immunity in proceedings brought pursuant to "Laws on the subject of Bankruptcies." That Congress is constrained to enact laws that are uniform in application, whether geographically or otherwise, cf. *Gibbons*, 455 U. S., at 470 (invalidating a bankruptcy law aimed at "one regional bankrupt railroad" and no one else), does not imply that it *lacks power* to enact bankruptcy legislation that is uniform in a more robust sense. See Haines 158–172. As our holding today demonstrates, Congress has the power to enact bankruptcy laws the purpose and effect of which are to ensure uniformity in treatment of state and private creditors. See *Sturges* v. *Crowninshield*, 4 Wheat. 122, 193–194 (1819) (Marshall, C. J.) ("The peculiar terms of the grant certainly deserve notice. Congress is not authorized merely to pass laws, the operation of which shall be uniform, but to *establish* uniform laws on the subject throughout the United States"); see also *In re Dehon, Inc.*, 327 B. R. 38, 57–58 (Bkrtcy. Ct. Mass. 2005) (discussing *Lathrop* v. *Drake*, 91 U. S. 516 (1876)); The Federalist Nos. 32 and 81, pp. 197–201, 481–491 (C. Rossiter ed. 1961) (A. Hamilton) (pointing to the "uniform[ity]" language of the Naturalization Clause, which appears in the same clause of Article I as the bankruptcy provision, as

text aside, the Framers, in adopting the Bankruptcy Clause, plainly intended to give Congress the power to redress the rampant injustice resulting from States' refusal to respect one another's discharge orders. As demonstrated by the First Congress' immediate consideration and the Sixth Congress' enactment of a provision granting federal courts the authority to release debtors from state prisons, the power to enact bankruptcy legislation was understood to carry with it the power to subordinate state sovereignty, albeit within a limited sphere.

The ineluctable conclusion, then, is that States agreed in the plan of the Convention not to assert any sovereign immunity defense they might have had in proceedings brought pursuant to "Laws on the subject of Bankruptcies." See *Blatchford*, 501 U. S., at 779 (observing that a State is not "subject to suit in federal court unless it has consented to suit, either expressly or in the 'plan of the convention'"); *Alden* v. *Maine*, 527 U. S., at 713 (same).[14] The scope of this consent was limited; the jurisdiction exercised in bankruptcy proceedings was chiefly *in rem*—a narrow jurisdiction that does not implicate state sovereignty to nearly the same degree as other kinds of jurisdic-

_____

an example of an instance where the Framers contemplated a "surrender of [States'] immunity in the plan of the convention").

[14] One might object that the writ of habeas corpus was no infringement on state sovereignty, and would not have been understood as such, because that writ, being in the nature of an injunction against a state official, does not commence or constitute a suit against the State. See *Ex parte Young*, 209 U. S. 123, 159–160 (1908). While that objection would be supported by precedent today, it would not have been apparent to the Framers. The *Ex parte Young* doctrine was not finally settled until over a century after the Framing and the enactment of the first bankruptcy statute. Indeed, we have recently characterized the doctrine as an expedient "fiction" necessary to ensure the supremacy of federal law. See *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89, 114, n. 25 (1984); see also *Idaho* v. *Coeur d'Alene Tribe of Idaho*, 521 U. S. 261, 281 (1997).

tion. But while the principal focus of the bankruptcy proceedings is and was always the res, some exercises of bankruptcy courts' powers—issuance of writs of habeas corpus included—unquestionably involved more than mere adjudication of rights in a res. In ratifying the Bankruptcy Clause, the States acquiesced in a subordination of whatever sovereign immunity they might otherwise have asserted in proceedings necessary to effectuate the *in rem* jurisdiction of the bankruptcy courts.[15]

## V

Neither our decision in *Hood*, which held that States could not assert sovereign immunity as a defense in adversary proceedings brought to adjudicate the dischargeability of student loans, nor the cases upon which it relied, see 541 U. S., at 448–449 (discussing *New York* v. *Irving Trust Co.*, 288 U. S. 329 (1933); *Gardner*, 329 U. S. 565; and *Van Huffel* v. *Harkelrode*, 284 U. S. 225 (1931)), rested on any statement Congress had made on the subject of state sovereign immunity. Nor does our decision today. The relevant question is not whether Congress has "abrogated" States' immunity in proceedings to recover preferential transfers. See 11 U. S. C. §106(a).[16] The question, rather, is whether Congress' determination that States should be amenable to such proceedings is within the scope of its power to enact "Laws on the subject of Bankruptcies." We think it beyond peradventure that it is.

Congress may, at its option, either treat States in the same way as other creditors insofar as concerns "Laws on

---

[15] We do not mean to suggest that every law labeled a "bankruptcy" law could, consistent with the Bankruptcy Clause, properly impinge upon state sovereign immunity.

[16] Cf. *Hoffman*, 492 U. S., at 101 (holding that, in an earlier version of 11 U. S. C. §106, Congress had failed to make sufficiently clear its intent to abrogate state sovereign immunity).

the subject of Bankruptcies" or exempt them from opera-tion of such laws.  Its power to do so arises from the Bank-ruptcy Clause itself; the relevant "abrogation" is the one effected in the plan of the Convention, not by statute.

The judgment of the Court of Appeals for the Sixth Circuit is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 04–885

_____

## CENTRAL VIRGINIA COMMUNITY COLLEGE, ET AL., PETITIONERS *v.* BERNARD KATZ, LIQUIDATING SUPERVISOR FOR WALLACE'S BOOKSTORES, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[January 23, 2006]

JUSTICE THOMAS, with whom THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE KENNEDY join, dissenting.

Under our Constitution, the States are not subject to suit by private parties for monetary relief absent their consent or a valid congressional abrogation, and it is "settled doctrine" that nothing in Article I of the Constitution establishes those preconditions. *Alden* v. *Maine*, 527 U. S. 706, 748 (1999). Yet the majority today casts aside these long-established principles to hold that the States are subject to suit by a rather unlikely class of individuals—bankruptcy trustees seeking recovery of preferential transfers for a bankrupt debtor's estate. This conclusion cannot be justified by the text, structure, or history of our Constitution. In addition, today's ruling is not only impossible to square with this Court's settled state sovereign immunity jurisprudence; it is also impossible to reach without overruling this Court's judgment in *Hoffman* v. *Connecticut Dept. of Income Maintenance*, 492 U. S. 96 (1989).

The majority maintains that the States' consent to suit can be ascertained from the history of the Bankruptcy Clause. But history confirms that the adoption of the Constitution merely established federal power to legislate in the area of bankruptcy law, and did not manifest an

additional intention to waive the States' sovereign immunity against suit. Accordingly, I respectfully dissent.

I

The majority does not appear to question the established framework for examining the question of state sovereign immunity under our Constitution. The Framers understood, and this Court reiterated over a century ago in *Hans* v. *Louisiana*, 134 U. S. 1 (1890), that

> "'It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. This is the general sense and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every state in the Union. *Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the states . . . .*'"

*Id.,* at 13 (quoting The Federalist No. 81, pp. 548-549 (J. Cooke ed. 1961)) (emphasis added and deleted) (hereinafter The Federalist No. 81). See also *Ex parte New York*, 256 U. S. 490, 497 (1921) ("That a State may not be sued without its consent is a fundamental rule of jurisprudence having so important a bearing upon the construction of the Constitution of the United States that it has become established by repeated decisions of this court that the entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a State without consent given"); *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 54 (1996).

These principles were further reinforced early in our Nation's history, when the people swiftly rejected this Court's decision in *Chisholm* v. *Georgia*, 2 Dall. 419 (1793), by ratifying the Eleventh Amendment less than two years later. See *Hans*, *supra*, at 11; *Reid* v. *Covert*,

354 U. S. 1, 14, n. 27 (1957). Thus, "[f]or over a century [since *Hans*] we have reaffirmed that federal jurisdiction over suits against unconsenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States.'" *Seminole Tribe*, *supra*, at 54 (quoting *Hans*, *supra*, at 15); see also *Seminole Tribe*, *supra*, at 54–55, n. 7 (collecting cases).

The majority finds a surrender of the States' immunity from suit in Article I of the Constitution, which authorizes Congress "[t]o establish . . . uniform Laws on the subject of Bankruptcies throughout the United States." §8, cl. 4. But nothing in the text of the Bankruptcy Clause suggests an abrogation or limitation of the States' sovereign immunity. Indeed, as this Court has noted on numerous occasions, "[t]he Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction." *Seminole Tribe*, *supra*, at 72–73. "[I]t is settled doctrine that neither substantive federal law nor attempted congressional abrogation under Article I bars a State from raising a constitutional defense of sovereign immunity in federal court." *Alden*, *supra*, at 748. See also *Kimel* v. *Florida Bd. of Regents*, 528 U. S. 62, 80 (2000); *Board of Trustees of Univ. of Ala.* v. *Garrett*, 531 U. S. 356, 364 (2001). And we have specifically applied this "settled doctrine" to bar abrogation of state sovereign immunity under various clauses within §8 of Article I. See, *e.g.*, *Seminole Tribe*, *supra*, at 44 (the Interstate and Indian Commerce Clauses); *Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank*, 527 U. S. 627 (1999) (the Patents Clause).

It is difficult to discern an intention to abrogate state sovereign immunity through the Bankruptcy Clause when no such intention has been found in any of the other clauses in Article I. Indeed, our cases are replete with acknowledgments that there is nothing special about the

Bankruptcy Clause in this regard. See *Seminole Tribe*, 517 U. S., at 72–73, n. 16; see also *id.*, at 93–94 (STEVENS, J., dissenting) ("In confronting the question whether a federal grant of jurisdiction is within the scope of Article III, as limited by the Eleventh Amendment, I see no reason to distinguish among statutes enacted pursuant to the power granted to Congress to regulate commerce among the several States, and with the Indian tribes, the power to establish uniform laws on the subject of bankruptcy, [or] the power to promote the progress of science and the arts by granting exclusive rights to authors and inventors" (citations omitted)); *id.*, at 77–78, and n. 1 (STEVENS, J., dissenting); *Hoffman*, 492 U. S., at 105 (SCALIA, J., concurring in judgment). Today's decision thus cannot be reconciled with our established sovereign immunity jurisprudence, which the majority does not purport to overturn.

The majority's departure from this Court's precedents is not limited to this general framework, however; the majority also overrules *sub silentio* this Court's holding in *Hoffman*, *supra*. The petitioner in *Hoffman*, *id.*, at 99—like respondent Katz here—sought to pursue a preference avoidance action against a state agency pursuant to 11 U. S. C. §547(b). The plurality opinion, joined by four Members of this Court, held that Eleventh Amendment immunity barred suit because Congress had failed to enact legislation sufficient to abrogate that immunity, and expressed no view on whether Congress possessed the constitutional power to do so. *Hoffman*, *supra*, at 104. JUSTICE SCALIA concurred in the judgment, arguing that there was no need to examine the statute because the Bankruptcy Clause does not empower Congress to enact legislation abrogating state sovereign immunity. See *id.*, at 105; see also *ibid.* (O'CONNOR, J., concurring) ("I agree with JUSTICE SCALIA that Congress may not abrogate the States' Eleventh Amendment immunity by enacting a statute under the Bankruptcy Clause"). Thus, a majority

of the Court in *Hoffman* agreed: (1) that a preference action in bankruptcy against a state agency is barred by sovereign immunity; and (2) that, at a minimum (and absent the State's consent), overcoming that immunity would require a clearer statutory abrogation than Congress had provided.[1]

After today's decision, however, *Hoffman* can no longer stand. For today's decision makes clear that *no action* of Congress is needed because the Bankruptcy Clause itself manifests the consent of the States to be sued. *Ante,* at 21.

## II

The majority supports its break from precedent by relying on historical evidence that purportedly reveals the Framers' intent to eliminate state sovereign immunity in bankruptcy proceedings. *Ante*, at 4, 15. The Framers undoubtedly wanted to give Congress the authority to enact a national law of bankruptcy, as the text of the Bankruptcy Clause confirms. But the majority goes further, contending that the Framers found it intolerable that bankruptcy laws could vary from State to State, and demanded the enactment of a single, uniform national body of bankruptcy law. *Ante*, at 7–10. The majority then concludes that, to achieve a uniform national bankruptcy law, the Framers must have intended to waive the States' sovereign immunity against suit. *Ante,* at 4. Both claims are unwarranted.

## A

In contending that the States waived their immunity from suit by adopting the Bankruptcy Clause, the majority conflates two distinct attributes of sovereignty: the authority of a sovereign to enact legislation regulating its own

---

[1] The parties in *Hoffman* likewise agreed that the suit was barred by Eleventh Amendment immunity absent some further action by Congress. 492 U. S., at 101.

citizens, and sovereign immunity against suit by private citizens.[2]  Nothing in the history of the Bankruptcy Clause suggests that, by including that clause in Article I, the founding generation intended to waive the latter aspect of sovereignty.  These two attributes of sovereignty often do not run together—and for purposes of enacting a uniform law of bankruptcy, they need not run together.

For example, Article I also empowers Congress to regulate interstate commerce and to protect copyrights and patents.  These provisions, no less than the Bankruptcy Clause, were motivated by the Framers' desire for nationally uniform legislation.  See James Madison, Preface to Debates in the Convention of 1787, reprinted in 3 M. Farrand, Records of the Federal Convention of 1787, pp. 539, 547–548 (1911) (hereinafter Farrand's Debates) (noting lack of national regulation of commerce and uniform bankruptcy law as defects under the Articles of Confederation); M. Farrand, The Framing of the Constitution of the United States 48 (1913) (noting that the Articles of Confederation failed to provide for uniform national regulation of naturalization, bankruptcy, copyrights, and patents).  Thus, we have recognized that "[t]he need for uniformity in the construction of patent law is undoubtedly important."  *Florida Prepaid*, 527 U. S., at 645.  Nonetheless, we have refused, in addressing patent law, to give the need for uniformity the weight the majority today assigns it in the context of bankruptcy, instead recognizing that this need "is a factor which belongs to the Article I patent-power calculus, rather than to any determination of whether a state plea of sovereign immunity deprives a

―――――――

[2] Immunity against suit is just "one of the attributes of sovereignty, . . . enjoyed by the government of every state in the Union."  The Federalist No. 81, at 549.  The sovereign power to legislate is a distinct attribute of sovereignty; it is discussed, for example, in a completely separate portion of the Federalist than immunity from suit.  See, *e.g.*, *id.*, No. 32.

patentee of property without due process of law." *Ibid.*

Nor is the abrogation of state sovereign immunity from suit necessary to the enactment of nationally uniform bankruptcy laws. The sovereign immunity of the States against suit does not undermine the objective of a uniform national law of bankruptcy, any more than does any differential treatment between different categories of creditors. Cf. *Railway Labor Executives' Assn.* v. *Gibbons*, 455 U. S. 457, 469 (1982) ("The uniformity requirement is not a straightjacket that forbids Congress to distinguish among classes of debtors, nor does it prohibit Congress from recognizing that state laws do not treat commercial transactions in a uniform manner").

## B

The majority also greatly exaggerates the depth of the Framers' fervor to enact a national bankruptcy regime. The idea of authorizing Congress to enact a nationally uniform bankruptcy law did not arise until late in the Constitutional Convention, which began in earnest on May 25, 1787. 1 Farrand's Debates xi. The Convention charged the Committee of Detail with putting forth a comprehensive draft Constitution, which it did on August 6. *Ibid.*; 2 *id.*, at 177. Yet the Convention did not consider the language that eventually became the Bankruptcy Clause until September 1, *id.,* at 483–485, and it adopted the provision with little debate two days later, *id.,* at 489. Under the majority's analysis, which emphasizes the Framers' zeal to enact a national law of bankruptcy, this timing is difficult to explain.

The majority's premise fares even worse in explaining the postratification period. The majority correctly notes that the practice of the early Congresses can provide valuable insight into the Framers' understanding of the Constitution. *Ante,* at 15. But early practice undermines, rather than supports, the majority's theory. "For over a

century after the Constitution, . . . the Bankruptcy Clause [authority] remained largely unexercised by Congress. . . . Thus, states were free to act in bankruptcy matters for all but 16 of the first 109 years after the Constitution was ratified." Tabb, The History of the Bankruptcy Laws in the United States, 3 Am. Bankr. Inst. L. Rev. 5, 13–14 (1995). And when Congress did act, it did so only in response to a major financial disaster, and it repealed the legislation in each instance shortly thereafter. *Id.*, at 14-21.[3] It was not until 1898, well over a century after the adoption of the Bankruptcy Clause, that Congress adopted the first permanent national bankruptcy law. 30 Stat. 544.

The historical record thus refutes, rather than supports, the majority's premise that the Framers placed paramount importance on the enactment of a nationally uniform bankruptcy law. In reality, for most of the first century of our Nation's history, the country survived without such a

_____

[3] For over a dozen years after the ratification of the Constitution, Congress failed to adopt a single bankruptcy law. See, *e.g.,* 9 Annals of Congress 2671 (1799) (noting that Congress had "not . . . passed [bankruptcy legislation] for these ten years past, and the States [have] legislated upon it in their own way" (statement of Rep. Baldwin)); 3 Farrand's Debates 380 (same)). It was not until April 4, 1800, that the Sixth Congress finally adopted our Nation's first bankruptcy law, ch. 19, 2 Stat. 19, and even that law left an ample role for state law, *id.*, §61, at 36. (By contrast, the very first Congress enacted, *inter alia*, patent and copyright legislation. 1 Stat. 109, 124.)

Moreover, that first Act was short-lived; Congress repealed it just three years later. 2 Stat. 248. And over a decade later, this Court confirmed what Congress' inattention had already communicated—that the Bankruptcy Clause does not vest exclusive power in Congress, but instead leaves an ample role for the States. See *Sturges* v. *Crowninshield*, 4 Wheat. 122 (1819). It was not until 1841 that Congress would enact another bankruptcy law, ch. 9, 5 Stat. 440, only to repeal it less than two years later, ch. 82, 5 *id.*, at 614. The economic upheaval of the Civil War caused Congress to pass another bankruptcy law in 1867, ch. 176, 14 Stat. 517, but that too was repealed after just over a decade, ch. 160, 20 Stat. 99.

law, relying instead on the laws of the several States.

Moreover, the majority identifies *no* historical evidence suggesting that the Framers or the early legislatures, even if they were anxious to establish a national bankruptcy law, contemplated that the States would subject themselves to private suit as creditors under that law. In fact, the historical record establishes that the Framers' held the opposite view. To the Framers, it was a particularly grave offense to a State's sovereignty to be hauled into court by a private citizen and forced to make payments on debts. Alexander Hamilton, the author of Federalist No. 81, followed his general discussion of state sovereign immunity by emphasizing that the Constitution would be especially solicitous of state sovereignty within the specific context of payment of state debts:

> "'[T]here is no color to pretend that the state governments would, by the adoption of that plan, be divested of the privilege of paying their own debts in their own way, free from every constraint but that which flows from the obligations of good faith. The contracts between a nation and individuals are only binding on the conscience of the sovereign, and have no pretension to a compulsive force. They confer no right of action independent of the sovereign will. To what purpose would it be to authorize suits against States for the debts they owe? How could recoveries be enforced? It is evident that it could not be done without waging war against the contracting State; and to ascribe to the federal courts by mere implication, and in destruction of a pre-existing right of the state governments, a power which would involve such a consequence, would be altogether forced and unwarrantable.'" *Hans*, 134 U. S., at 13 (quoting The Federalist No. 81, at 549).

C

The majority attempts to bolster its historical argument by making three additional observations about the bankruptcy power: (1) Congress' early provision of habeas corpus relief in bankruptcy to forbid the imprisonment of a debtor by one State, in violation of a discharge order issued by the courts of another State, *ante*, at 6–7, 16–17; (2) the inability of debtors, first in the American Colonies and then under the Articles of Confederation, to enforce in one state court a discharge order issued by another state court, *ante*, at 7–11; and (3) the historical understanding that bankruptcy jurisdiction is principally *in rem*, *ante*, at 11–15. The implication is that, if these specific observations about bankruptcy are correct, then States must necessarily be subject to suit in transfer recovery proceedings, if not also in other bankruptcy settings. *Ante,* at 12; *ante*, at 19–20. But none of these observations comes close to demonstrating that, under the Bankruptcy Clause, the States may be sued by private parties for monetary relief.[4]

1

The availability of habeas relief in bankruptcy between 1800 and 1803 does not support respondent's effort to obtain monetary relief in bankruptcy against state agencies today.[5] The habeas writ was well established by the

_____

[4] To be sure, the majority opinion adds, in a footnote, that "[w]e do not mean to suggest that every law labeled a 'bankruptcy' law could, consistent with the Bankruptcy Clause, properly impinge upon state sovereign immunity." *Ante*, at 20, n. 15. But the majority offers no explanation of this statement; certainly it offers no principled basis on which to draw distinctions in future cases.

[5] This is particularly so given the absence of any known application of that law (let alone any test of its validity) during that time. The provision was enacted into law on April 4, 1800, ch. 19, 2 Stat. 19, and repealed on December 19, 1803, ch. 6, 2 *id.*, at 248. The sole reference cited by the majority is *In re Comstock*, 6 F. Cas. 237 (No. 3,073) (Vt. 1842), see *ante*, at 16–17, but that ruling, issued nearly 40 years after

time of the Framing, and consistent with then-prevailing notions of sovereignty. In *Ex parte Young*, 209 U. S. 123 (1908), this Court held that a petition for the writ is a suit against a state official, not a suit against a State, and thus does not offend the Eleventh Amendment:

> "The right to so discharge has not been doubted by this court, and it has never been supposed there was any suit against the state by reason of serving the writ upon one of the officers of the state in whose custody the person was found. In some of the cases the writ has been refused as matter of discretion; but in others it has been granted, while the power has been fully recognized in all." *Id.*, at 168 (collecting cases).

This Court has reaffirmed *Young* repeatedly—including in *Seminole Tribe*, 517 U. S., at 71, n. 14. Although the majority observes that *Young* was not issued "until over a century after the Framing and the enactment of the first bankruptcy statute," *ante*, at 20, n. 14, this observation does nothing to reconcile the majority's analysis with *Young,* as the majority does not purport to question the historical underpinnings of *Young*'s holding. The availability of federal habeas relief to debtors in state prisons thus has no bearing whatsoever on whether the Bankruptcy Clause authorizes suits against the States for money damages.[6]

——————

the 1800 Act's repeal, merely noted in dicta the prior existence of the habeas provision.

[6] The majority also contends that the provision for habeas relief in the 1800 bankruptcy law is "remarkable not least because it would be another 67 years, after ratification of the Fourteenth Amendment, before the writ would be made generally available to state prisoners." *Ante*, at 17. The implication is that the Bankruptcy Clause shares a similar pedigree with the Fourteenth Amendment, which (unlike Article I of the Constitution) authorizes Congress to abrogate state sovereign immunity against suit. See, *e.g.*, *Fitzpatrick* v. *Bitzer*, 427

2

The majority's second observation—that the Framers were concerned that, under the Articles of Confederation, debtors were unable to obtain discharge orders issued by the court of one State that would be binding in the court of another State, *ante*, at 7–11—implicates nothing more than the application of full faith and credit, as is apparent from the majority opinion itself. Accordingly, it has nothing to do with state sovereign immunity from suit.

To support its observation, the majority describes at length two Pennsylvania court rulings issued under the Articles of Confederation. See *James* v. *Allen*, 1 Dall. 188 (C. P. Phila. Cty. 1786); *Millar* v. *Hall*, 1 Dall. 229 (Pa. 1788). But as the majority's explanation makes clear, the problem demonstrated by these cases is the need for recognition of sister-state judgments by state courts, not disregard for state sovereign immunity against suit in federal courts. Both *James* and *Millar* involved litigation between a private debtor and a private creditor. In both cases, the creditor filed suit in a Pennsylvania court to enforce a debt. And in both cases, the debtor sought but failed to obtain recognition of a judgment of discharge that had previously been entered by a court of another State. *Ante*, at 10.

Accordingly, it is unsurprising that, when the issue of bankruptcy arose at the Constitutional Convention, it was

--------

U. S. 445 (1976). But as the majority recognizes, *ante*, at 17, n. 11, Congress *did* enact other habeas provisions prior to the Fourteenth Amendment. See 4 Stat. 632; 5 Stat. 539; see generally W. Duker, A Constitutional History of Habeas Corpus 187–189 (1980) (discussing the 1833 and 1842 Acts). The Fourteenth Amendment bears no relevance to this discussion in any event, because as I have explained above, habeas relief simply does not offend the Framers' view of state sovereign immunity. See also *Young*, 209 U. S., at 150 ("[A] decision of this case does not require an examination or decision of the question whether [the] adoption [of the Fourteenth Amendment] in any way altered or limited the effect of the [Eleventh] Amendment").

also within the context of full faith and credit. See *ante*, at 10–11.[7] As the majority correctly points out, the Framers "plainly intended to give Congress the power to redress the rampant injustice resulting from States' refusal to respect one another's discharge orders." *Ante*, at 19. But redress of that "rampant injustice" turned entirely on binding state courts to respect the discharge orders of their sister States under the Full Faith and Credit Clause, not on the authorization of private suits against the States.

3

Finally, the majority observes that the bankruptcy power is principally exercised through *in rem* jurisdiction. *Ante*, at 11–15. The fact that certain aspects of the bankruptcy power may be characterized as *in rem*, however, does not determine whether or not the States enjoy sovereign immunity against such *in rem* suits. And it certainly does not answer the question presented in this case: whether the Bankruptcy Clause subjects the States to transfer recovery proceedings—proceedings the majority describes as "ancillary to and in furtherance of the court's *in rem* jurisdiction," though not necessarily themselves *in rem*, *ante*, at 14.

Two years ago, this Court held that a State is bound by a bankruptcy court's discharge order, notwithstanding the

———————

[7] The same point was made in *Railway Labor Executives' Assn.* v. *Gibbons*, 455 U. S. 457 (1982): "Prior to the drafting of the Constitution, at least four States followed the practice of passing private Acts to relieve individual debtors. Given the sovereign status of the States, questions were raised as to whether one State had to recognize the relief given to a debtor by another State [citing *James* and *Millar*]. Uniformity among state debtor insolvency laws was an impossibility and the practice of passing private bankruptcy laws was subject to abuse if the legislators were less than honest. Thus, it is not surprising that the Bankruptcy Clause was introduced during discussion of the Full Faith and Credit Clause." *Id.*, at 472 (citations omitted).

State's invocation of sovereign immunity, because such actions arise out of *in rem* jurisdiction. See *Tennessee Student Assistance Corporation* v. *Hood*, 541 U. S. 440, 448 (2004). In doing so, however, the Court explicitly distinguished recovery of preferential transfers, noting that the debt discharge proceedings there were "unlike an adversary proceeding by the bankruptcy trustee seeking to recover property in the hands of the State on the grounds that the transfer was a voidable preference." *Id.*, at 454.

The fact that transfer recovery proceedings fall outside any possible *in rem* exception to sovereign immunity is confirmed by *United States* v. *Nordic Village, Inc.*, 503 U. S. 30 (1992), which involved similar facts. There, the Bankruptcy Trustee filed a transfer avoidance action against the United States, in order to recover a recent payment the debtor had made to the Internal Revenue Service on a tax debt. See *id.*, at 31. After determining that the United States had not waived its sovereign immunity, the Court rejected the trustee's alternative argument based on *in rem* jurisdiction. As the Court explained, "[r]espondent sought to recover a sum of money, not 'particular dollars,' so there was no *res* to which the court's *in rem* jurisdiction could have attached." *Id.*, at 38 (quoting *Begier* v. *IRS*, 496 U. S. 53, 62 (1990) (internal citations omitted and emphasis deleted)).[8]

————

[8] *Begier* involved funds held by the debtor in statutory trust for the United States—so its analysis of those "particular dollars" does not help the respondent in this case. 496 U. S., at 62 (emphasis deleted). Nor does *United States* v. *Whiting Pools, Inc.*, 462 U. S. 198 (1983), support the majority's effort. In *Whiting Pools*, the United States waived its immunity by filing suit. See *id.*, at 200–01; see also *Nordic Village,* 503 U. S., at 39 ("The Court's opinion in *Whiting Pools* contains no discussion of §106(c) [the waiver provision]"). Furthermore, in *Whiting Pools* the Government possessed merely a secured interest in the property on the basis of a tax lien, see 462 U. S., at 202. By contrast, here, as in *Nordic Village*, it is uncontested that the State owns the funds, barring any subsequent transfer by operation of bankruptcy

The majority attempts to evade *Nordic Village* by claiming that "the trustee in this case, unlike the one in *Nordic Village*, seeks, in the alternative, both return of the 'value' of the preference, and return of the actual 'property transferred.'" *Ante*, at 14, n. 10 (quoting 11 U. S. C. §550(a)). But where, as here, the property in question is money, there is no practical distinction between these two options, and surely we did not reach the result in *Nordic Village* because of an accident of pleading. Moreover, it is hardly clear that the trustee in *Nordic Village* failed to ask for a "return" of the "'property transferred,'" *ante*, at 14, n. 10, and the majority does not cite anything to support its assertion. See also *Nordic Village*, *supra*, at 31 ("[T]he trustee . . . commenced an adversary proceeding . . . seeking to recover, among other transfers, the $20,000 paid . . . to the IRS"); *In re Nordic Village, Inc.*, 915 F. 2d 1049, 1051 (CA6 1990) ("The trustee subsequently initiated a proceeding to recover several unauthorized post-petition transfers, including the transfer to the IRS").

In light of the weakness of its historical evidence that the States consented to be sued in bankruptcy proceedings, the majority's effort to recast respondent's action as *in rem* is understandable, but unconvincing.

\*    \*    \*

It would be one thing if the majority simply wanted to overrule *Seminole Tribe* altogether. That would be wrong, but at least the terms of our disagreement would be transparent. The majority's action today, by contrast, is difficult to comprehend. Nothing in the text, structure, or history of the Constitution indicates that the Bankruptcy Clause, in contrast to all of the other provisions of Article

law. See 503 U. S., at 39 ("A suit for payment of funds from the Treasury is quite different from a suit for the return of tangible property in which the debtor retained ownership").

I, manifests the States' consent to be sued by private citizens.

I respectfully dissent.